**FREDERICK L., a minor by his mother, Delores L., on behalf of himself and all others similarly situated**

v.

**Arthur THOMAS, Individually and in his capacity as President of the Board of Education of Philadelphia, et al.**

**Civ. A. No. 74-52.**

United States District Court, E. D. Pennsylvania.

Jan. 7, 1976.

H. David Kraut, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Stephen Miller, Education Law Center, Inc., Philadelphia, Pa., for plaintiff-intervenor Dela. Valley Assoc. for Children with Learning Disabilities.

Robert T. Lear, Law Dept. School District of Philadelphia, Philadelphia, Pa., for defendant.

Stinson W. Stroup and Maria P. Vickers, Asst. Attys. Gen., Philadelphia, Pa., for Commonwealth.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This case is before the Court in an unusual posture. A trial on the merits was held while there was an outstanding "motion to dismiss." We will now deny that motion. Counsel will be given an opportunity to be heard in argument on the trial record before we make findings of fact and conclusions of law.

 Before setting forth our reasons for denying the motion, it is necessary to explain the basis for the unorthodox sequence of the proceedings. On January 9, 1974, a class action complaint was filed on behalf of Frederick L. and all other children with "specific learning disabilities," [1] who are allegedly deprived

---

1. The complaint adopts the definition of the Penna. Department of Education, as stated in Standards for the Operation of Special Education Programs and Services, 1972. Plaintiff children with specific learning disabilities have 'disorder[s] in one or more of the basic psychological processes involved in understanding or in using language, spoken or written . . .. Such disorders include such conditions as perceptual handicaps,

of an education appropriate to their specialized needs by the defendants, the School District of Philadelphia and named officials of said District. Federal jurisdiction was based on alleged violations of the United States Constitution and of the Civil Rights Act, 42 U.S.C. § 1983, and pendant state law claims were also pleaded. The original defendants answered the complaint on April 29, 1974. The Commonwealth of Pennsylvania was given leave to intervene as a party defendant on June 15, 1974. It filed an answer to the Complaint on September 30, 1974. There was extensive pretrial discovery, together with negotiations that brought the dispute close to settlement. On September 15, 1975, the defendant-intervenor, Commonwealth of Pennsylvania, filed a "Motion to Dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure," in which the original defendants subsequently joined. This motion was not properly presented under Fed.R.Civ.P. 12(b), since the Commonwealth had answered the complaint almost a year earlier. The court treated the motion as if it had been made pursuant to Rule 12(c), Motion for Judgment on the Pleadings.[2] However, Rule 12(c) provides, in pertinent part:

> "After the pleadings are closed *but within such time as not to delay the trial*, any party may move for judgment on the pleadings." (Emphasis supplied)

The Commonwealth filed its motion ten days after the originally scheduled trial date, and about a week before the new date, for which the court had reserved two weeks in its calendar. The court decided that at least one of the grounds asserted in the motion—abstention—

raised serious issues, but they could not be thoroughly evaluated before the trial date. Unable to delay the trial but not wanting to deny the motion on a procedural ground, especially since the asserted grounds could be raised by motion at trial under Fed.R.Civ.P. 12(h)(2–3)[3], the court took the motion under advisement and commenced the trial.

The motion asserts three grounds for dismissal of the complaint or stay of the proceedings: (a) failure to state a cause of action; (b) mootness; and (c) abstention. We will discuss each in turn. Although each ground is rejected, we have left open the possibility that partial abstention may become appropriate at some future time.

## A. Failure to State a Cause of Action

■ The defendants do not deny that the plaintiffs have stated a colorable claim under state statutory law. By directing their arguments at the constitutional claims in the complaint, the defendants have, in effect, attacked the federal jurisdictional basis of the case. *United Mineworkers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The question before us is whether the plaintiffs, under any of their constitutional theories, have stated a colorable claim which may entitle them to relief. Their claim under the Equal Protection Clause of the Fourteenth Amendment satisfies this test, and therefore we need not inquire into the soundness of the plaintiffs' right-to-education claim under the First, Ninth and Fourteenth Amendments.

The complaint alleges that in the School District of Philadelphia, children with specific learning disabilities who

---

brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.'

**2.** This still is not an entirely satisfactory characterization of the motion. Although appropriate for the first asserted ground—failure to state a cause of action—the second asserted ground—mootness—could also have been entertained under Fed.R.Civ.P. 12(h)(3). Moreover, a motion for abstention (which is the third asserted ground) can lead either to a stay of proceedings *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85

L.Ed. 971 (1941), or (though perhaps only in a diversity case) to a dismissal, *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

**3.** Application of the abstention doctrine can result in a dismissal of the action as if for lack of subject matter jurisdiction, *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1942), although a stay of proceedings in the federal court is the more common course of action.

are not receiving instruction specially suited to their handicaps are being discriminated against in the following respects. First, the Commonwealth and School District are providing "normal" children with a free public education appropriate to their needs, but are denying an equal educational opportunity to the plaintiffs. Admittedly, most of the plaintiffs are afforded access to the same curriculum as normal children, but it is argued that the test of *equal* treatment is the suitability of the instructional services for the educational needs of the child. Many of the plaintiffs, it is said, cannot derive *any* educational benefit from the normal curriculum if that experience is not mediated by special instruction aimed at their learning handicaps. We are told that inappropriate educational placements predictably lead to severe frustration and to other emotional disturbances which impede the learning process and erupt into anti-social behavior. On this basis it is argued that some or all of the class is constructively excluded from public educational services, because—for them—the instruction offered is virtually useless, if not positively harmful.

Second, the plaintiffs say that the Commonwealth and the School District of Philadelphia are providing mentally retarded children with a free public education especially suited to their individual needs, but are denying learning disabled children an equal educational opportunity, namely, a curriculum adapted to overcome their handicaps.

Third, it is alleged that the state and the district are unlawfully discriminating between those few learning disabled children who it is specially instructing, and the plaintiffs who are not given special instruction.

■ Whether the plaintiffs are to be deemed "excluded" from public education is, we think, a mixed question of fact and law. We note that the Supreme Court, in *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) did not reach the question whether non-English speaking Chinese children were, for the purposes of equal protection analysis, being constructively excluded from public educational services when they were admitted to the schools on the same basis as other children, that is, into classes conducted only in English. Furthermore, in *San Antonio School District v. Rodriguez*, 411 U.S. 1, 37, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Court left open the possibility that the denial of a minimally adequate educational opportunity may trench upon a fundamental interest, if the state has undertaken to provide a free public education.[4] We find that the plaintiffs' legal propositions are not completely devoid of merit, and that their offer of proof on the factual question is satisfactory. Plaintiffs may be able to show that the defendants' policies must be subjected to strict scrutiny because a classification has functionally excluded them from a minimally adequate education.

■ The complaint also includes a colorable claim that these classifications do not satisfy the equal protection test of rationality. The appropriate test for this case would not be the traditional rationality standard. See, e. g. *Lindsley v. National Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The interests implicated in this dispute require the defendants to show that their actions have a basis in fact which rationally advances an actual purpose of the legislative scheme. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); See also, Gunther, "Forward: In Search of An Evolving Doctrine on a Changing Court: A Model for a Newer

---

4. This minimum education equal protection theory is distinct from the plaintiffs' right-to-education claim based on the First, Ninth, and Fourteenth Amendments. The latter theory would impose on the state an absolute duty to provide the minimal educational services necessary to prepare children for democratic citizenship in their adult lives.

Equal Protection," 86 Harv.L.Rev. 1 (1972).

*Wiesenfeld, supra*, involved a classification by sex, a quasi-suspect classification. Analogously, the instant case involves education, a quasi-fundamental interest.[5] Moreover, although learning disabled children are not a suspect class they do exhibit some of the essential characteristics of suspect classes—minority status and powerlessness. We think that the Supreme Court, if presented with the plaintiffs' equal protection claim, would apply the as yet hard to define middle test of equal protection, sometimes referred to as "strict rationality." For example, in *Weinberger, supra*, the Court, without purporting to apply the compelling state interest test, noted that a legislative discrimination, even if it can be rationally explained and "is not entirely without empirical support," 420 U.S. at 645, 95 S.Ct. at 1232, 43 L.Ed.2d at 523, must nevertheless withstand scrutiny in light of the primary purposes of the legislative scheme of which it is a part.

■ The policy of the Commonwealth of Pennsylvania is to make available for every child in the state a free public education appropriate to his needs.[6] The defendants contend that the current level and distribution of instructional services is rationally related to this goal, for the following reasons. Once the state undertakes to correct a social problem, it does not have to solve every aspect of the problem at the very beginning. The state of the art in the field of learning disabilities is uncertain both in regard to diagnosis and remedial instruction—and it is therefore rational to move more slowly in that area than in the furnishing of appropriate instruction for normal and for mentally retarded children. An additional hindrance to establishing services for the learning disabled is said to be a dearth of trained personnel. The defendant admits, that subject to the constraints just noted as well as the limiting factor of finite resources, the state and district must expend their funds equitably and without entirely excluding any child from a public education.[7] The plaintiffs offer to prove that the factual contentions which the defendants rely on in this argument are incorrect.

It would serve no purpose for us to speculate about which combinations of facts, if proven, would support or refute the equal protection claim stated in the complaint. The defendants will have to demonstrate that their classification of learning disabled children is a means to achieving the declared legislative purpose, and that the choice of the method has a basis in fact. Since the defendants' factual contentions in this connection are disputed, we cannot grant a judgment on the pleadings.

5. As we have said, the Supreme Court has not ruled out that complete denial (by a state which has created a public school system) of a minimally adequate education may involve a fundamental interest.

6. The Commonwealth made the following statement of policy as part of the *P.A.R.C.* consent decree:

"The Commonwealth of the Pennsylvania has undertaken to provide a free public education to all of its children between the ages of six and twenty-one years, and, even more specifically, has undertaken to provide education and training for all of its exceptional children." 334 F.Supp. 1257 (E.D.Pa.1971) State Board of Education Regulation § 13.-2(a) provides, in part:

"It shall be the policy of the Board, through the secretary of education to provide exceptional school-aged persons with quality special education programs and services which will ultimately enable them to participate as fully as possible in appropriate activities of daily living."

7. They quote approvingly the following passage from *Mills v. Board of Education of the District of Columbia*, 348 F.Supp. 866, 876 (D.D.C.1972):

"If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such a manner that no child is entirely excluded from a publicly supported education."

## B. Mootness

The defendants contend that the regulations enacted by the State Board of Education on June 3, 1975, provide plaintiffs with relief at least equal to any that the court might grant them as a result of this suit. Particular emphasis is placed on the procedures for parent-initiated due process hearings. It is said that these hearings will make the program for identifying learning disabled children fully effective.

■ Once the existence of a justiciable dispute has been established, the subsequent enactment of a statute or regulation does not moot the action unless the moving party can convince the court that implementation of the new rule will remediate past injuries; and, that the court will not find it necessary, if the defendants are found liable, to order them to change their present course of action. *Panitch v. State of Wisconsin*, 371 F.Supp. 955 (E.D.Wis.1974). *Harrison v. Michigan*, 350 F.Supp. 846 (E.D. Mich., S.D.1972). Neither requirement is satisfied in this case.

■ First, stipulated facts and evidence adduced at trial raise serious doubts about the sufficiency of due process hearings (and related procedures) for identifying exceptional children. The due process procedure makes it possible for a parent who thinks its child has a learning disability to have a further evaluation made by the school. It has been shown, however, that professional educators often have difficulty recognizing learning disabilities. It thus remains to be shown that lay persons will be able to identify the admittedly large numbers of learning disabled children which have not been screened out already by teachers and school psychologists. Even if we assume that similar due process procedures have been a major asset in the identification of mentally retarded children, that experience is not directly applicable to the present problem because one can recognize the symptoms of retardedness much more easily than the symptoms of a learning disability.

Second, we cannot conclude that full implementation of the regulations is imminent.

Third, the defendants have not explained how the plaintiffs' claims for declaratory relief, compensatory education, and monetary damages have been mooted. Even if we credited the defendants' contentions in full, we would not dismiss this case, but only would refrain from ordering injunctive relief.

## C. Abstention

The crux of the plaintiffs' prayer for relief is their request for an injunction enjoining the defendants to:

"(a) provide named and class plaintiffs with an adequate education suited to their needs.

(b) institute a system to identify and place named and class plaintiffs in appropriate facilities."

The plaintiffs would be entitled to this relief if they prevailed on the merits of their state statutory claim. Since the constitutional issues presented by this case are difficult ones, and a favorable decision for the plaintiffs on the state law claims would obviate the need for a constitutional adjudication, we must proceed in a manner that may avoid the need for a constitutional ground for a decision. The defendants contend that the proper way to accomplish this objective is for the court to stay these proceedings. The plaintiffs would then institute a suit in state court and secure an adjudication of their state law claims in that forum. The abstention doctrine makes a stay necessary, it is said, because the state law is unclear.

■ The abstention doctrine was cast in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Its rationale is that the federal court should, by abstaining, avoid unnecessary or premature decision of constitutional questions, and avoid needless friction in federal-state relations. Abstention advances these policies, however, only when the state law is unclear. If the law is clear, then decid-

ing a state law question as required by a statute or precedent conserves state judicial resources yet re-affirms the authority of the state government.

These general principles are easier to state than to apply. One difficulty is determining whether the state law is "clear". Another problem is balancing the policies of the abstention doctrine against other policies and equities, for example, the policy favoring prompt adjudication of civil rights claims.

██ If clarity is a borderline question, we should ask whether the dispute involves a sensitive area of state or local interest. *Reetz v. Bozanich*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), (fishing rights in Alaska); *Reid v. Board of Education of City of New York*, 453 F.2d 238, 243 (2d Cir. 1972), (educational services for handicapped children). We must be especially scrupulous before concluding that the law is clear if the matter would otherwise be decided by a forum with particular expertise. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The absence of judicial construction does not, by itself, render a statute unclear. On the other hand, inconsistent interpretations by different state courts and by executive officers are best resolved in the state appellate courts. *Harris v. Moore*, 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975). The abstention doctrine is less favored when the plaintiff has alleged the violation of a fundamental right. Compare *Reetz, supra*, and *Askew v. Hargrave*, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), with *Wisconsin v.*

*Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

In *Conover v. Montemuro*, 477 F.2d 1073 (3d Cir. 1973), the Third Circuit Court of Appeals held that abstention was not proper in a class action suit challenging intake procedures in the state juvenile court system. More precisely, the court said that the district court's abstention was improper because it did not take into account certain factors, namely, the need for prompt resolution of claims under the Civil Rights Act [8], and the possibility that the district court was telling the plaintiffs to pursue state remedies that might not exist.[9]

The three-judge court which decided *Pennsylvania Association of Retarded Children v. Commonwealth of Pennsylvania*, 343 F.Supp. 279 (E.D.Pa.1972), hereafter *P.A.R.C.*, also rejected an argument that it should abstain. The motion was made by a co-defendant at an unusual juncture in the case—the court was about to approve a consent agreement that had been drawn up primarily by the parties to the suit, with the active participation of the Attorney General, the Secretary of Education, and the Secretary of Welfare. The decree resolved several sensitive and difficult questions about the meaning of the Education Code. However, it would not create friction between the state and federal branches of government, said the Court, because these state officials affirmatively requested its adoption.

The *P.A.R.C.* court emphasized that abstention is an equitable doctrine, and in accordance with that observation it

**8.** "Weighed against the undesirability of a premature decision of the federal issue is the mandate from Congress in the Civil Rights Acts passed pursuant to the fourteenth amendment that federal courts will afford a prompt remedy for violations of that amendment and that such remedy includes federal fact finding." 477 F.2d at 1079–1080.

**9.** "[W]e know of no Pennsylvania procedure whereby [the plaintiffs] may test the legality of the steps leading to a decision to file a formal petition against them. Such a procedure may exist, but it has not been called to our attention. Nor have the defendants called

to our attention any civil remedy, outside the scope of the Pennsylvania Juvenile Court Act, by which the class members might obtain a construction of the Pennsylvania statute which would avoid a decision by the federal courts on the fourteenth amendment claims. . . . In such circumstances we may not, on the appellate level, affirm on the basis of a *Pullman* type abstention which the district court did not consider. At the same time, since the district court made no findings of fact, we cannot at this stage of the case rule out the possible propriety of such an exercise of the district court's discretion." 477 F.2d at 1081.

noted that a district court could, within its sound discretion, adopt flexible procedures to best reconcile the underlying policies of the *Pullman* doctrine with other important interests affected by a case. An example of this flexibility would be to abstain on one issue in a case, and adjudicate another.[10] A similar path was taken in *New York State Association for Retarded Children, Inc., v. Rockefeller*, 357 F.Supp. 752 (E.D.N.Y. 1973). The court found that certain claims which had been thoroughly tried before the court required immediate attention, lest the plaintiffs suffer irreparable harm, 357 F.Supp. at 767, but that "the defendants appear to be making a substantial effort to comply with the requirements of the [new law]" 357 F.Supp. at 768. It concluded:

> "For these reasons, the court will not abstain, but will restrict its relief . . . ." 357 F.Supp. at 768.

Procedural flexibility in dealing with abstention problems again was encouraged in *Conover, supra.* After holding a trial on the merits, but before making his findings of fact, the trial judge had dismissed the action. The court of appeals reversed the dismissal, but it did not preclude the lower court from reconsidering abstention after allowing supplementation of the record, 477 F.2d at 1082, or after making findings of fact, 477 F.2d at 1081.

■ Such flexibility is called for in the present case.[11] We are not being asked to declare a state statute unconstitutional. Rather, the plaintiffs claim that the education laws of Pennsylvania are not being fully enforced, and as a result they are being denied a free public education appropriate to their needs. Since substantially all retarded children and children of normal ability are being given adequate services under the statute, the plaintiffs say they are being discriminated against in violation of the equal protection clause. The statutes pertaining to the education of exceptional children [12] are relatively straightforward. The plaintiffs may be able to prove a set of facts which establishes the liability of the defendants, without having to rely on any unclear areas of the statutory scheme. It would be premature to abstain, now, because it is possible that on some other set of facts we would be compelled to resolve difficult state law issues.

This approach is not without its disadvantages. It may yet become necessary for the court to abstain without a complete disposition of the pendent claims. This could occur in the liability phase, or during the fashioning of relief (should liability be found). Relief would be governed by state law if the court had, up to that time, avoided decision of the constitutional claim. If, however, relief under state law, whether fashioned by this court or by the state judiciary, failed to remedy the injuries caused by the defendants' alleged unconstitutional actions, it would be incumbent upon us to adjudicate the constitutional claims if the dispute were returned to our jurisdiction.

■ These contingencies are outweighed by the real possibility that the state law claim can be adjudicated without abstention, and by the irreparable harm that could result from further delay in the decision of this case. If the plaintiffs rights have been violated, the injury that is accruing is the deprival of an education adequate to prepare them for lives as literate, self-sufficient, and self-confident adults. It is not insignificant that the defendants waited until

---

10. "Hence, assuming that no Consent Agreement was presented, we would have been faced with an unusual situation—divisible abstention—half of the case commanding abstention and the other half requiring a decision. Under these circumstances, primarily because of the distinctiveness of the two issues . . . it would have been sensible to abstain on the equal protection issue but decide the due process question." 343 F.Supp. at 279.

11. Like the lower court in *Conover*, we are at a point between trial and factfinding.

12. Learning disabled children are one category of exceptional children. State Board of Education Regulations, § 13.1 (June 3, 1975).

more than twenty-one months after the complaint was filed to make this motion.[13] Counsel for the defendants have not shown us that if a suit were instituted by the plaintiffs in state court it could be expedited. Nor have we been informed of any pending state court decisions that would decide the state law questions we may have to confront. There were two related state cases pending when the Second Circuit Court of appeals sustained a lower court's abstention in *Reid, supra.* It was noted:

"Although the abstention doctrine does not depend upon the pendency of a state court action . . . there is greater reason to abstain when a state court decision may be imminent." 453 F.2d at 243, n. 9.

The duty of school districts to identify exceptional children and plan special instruction for them is set forth with relative clarity in 24 P.S. § 13–1371 et seq.[14] Before P.A.R.C., supra, it was uncertain to what extent, if any, the scope of these duties was narrowed by provisions in the Education Code which dealt with the exclusion, discipline, and placement of school children.[15] The defendants have correctly pointed out that there is still an open question about the quality and thoroughness of the special instruction of learning disabled children that is mandated by the Code. The General Assembly has, within broad limits, delegated the State Board of Education the authority to set curriculum guidelines. The Board has subdelegated a substantial part of its discretion to local officials and local staff.

Consequently, statutory rights under this law derives their content, in large part, from the professional judgment of educators. A challenge to the quality of a school system's special education services may be a challenge to the logical and factual basis of the educators' discretionary decisions. The plaintiffs contend that state and federal courts find it equally difficult to interpret legal standards which incorporate scientific and

---

**13.** In *Conover, supra,* a motion for abstention was made twenty-one days after the filing of the complaint. It was denied then, but renewed after the trial.

**14.** § 13–1371 provides in part:

"(1) The term 'exceptional children' shall mean children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that *they require special education facilities* or services . . ." (emphasis supplied)

State Board of Education Regulations, § 13.1 provides in part:

"*Handicapped school-aged persons—*

\* \* \* \* \* \*

(b) Physically handicapped persons who are . . . brain damaged, learning disabled . . ."

§ 13–1371 further provides in part:

"(2) It shall be the duty of the district superintendent, in every school district . . . to secure information and report . . . *every* exceptional child within said district. As soon thereafter as possible the child shall be examined by a . . . school psychologist, and also by any other expert which the type of handicap and the child's condition may necessitate. . . ." (emphasis supplied)

§ 13–1372 provides in part:

"(1) Standards . . . . The State Board of Education shall adopt and prescribe standards and regulations for the *proper* education and training of *all* exceptional children by school districts. . . ." (emphasis supplied)

State Board of Education Regulations § 13.6 provides in part:

"(d) The following priority order of educational placement for handicapped school-aged persons shall be followed except where a deviation is needed to meet the appropriate needs of the person or the purpose of these regulations.

(1) A regular class in a regular school *with supporting services.*

(2) A school district special education program in a regular school; including homebound instruction.

(3) A school district special education program in a special facility.

(4) an intermediate unit program in a regular school.

(5) An intermediate unit program in a special facility.

(6) An approved private school program.

(7) A state school program.

(8) An approved out-of-state program.

(9) An intermediate unit program of instruction in the home."

(emphasis supplied)

**15.** 24 P.S. §§ 13–1304, 13–1318, 13–1326, 13–1330(2), 13–1371(1), 13–1372(3), 13–1375 and 13–1376.

professional judgments, and therefore unclarity in the state law, if it stems from these justiciability problems, does not require abstention. But even if we assume the plaintiffs are correct that the state courts have no greater expertise in these matters [16], they do have greater legitimacy. If the law is unclear, for whatever reason, the federal court's decision can be made anomalous by a later state court opinion, leaving an inconsistency which could interfere with state policy. The state decision, of course, would be authoritative. In addition, the state judiciary may be interested in developing consistent guidelines for its review, generally, of the discretionary actions taken by school officials pursuant to state law.

Our decision today does not preclude abstention in the future should we otherwise have to decide an especially difficult state law question about the level of services. The plaintiffs' pendent claims, however, may only require legal conclusions about identification and placement.

When the plaintiffs most recently summarized the relief sought, they stated:

"Plaintiffs are not requesting that this court establish a specific quantum limit on the extent of the special educational services or facilities offered to learning disabled children. Rather they request that the School District of Philadelphia be ordered to provide any 'proper education' *that the School District determines* is responsive to the needs of learning disabled children." Supplemental Memorandum, p. 3 (emphasis supplied)

The suggestion that the plaintiffs could abide by the School District's determination may be optimistic, but it is not fanciful.[17] Already, these parties have stipulated:

"The proposal suggested in court on September 29, 1975 (attached as Exhibit 'A' and incorporated herein by reference) by Dr. Nettie Bartel, one of plaintiffs' expert witnesses, is a reasonable means to identify students with learning disabilities and to provide them with appropriate educational placement.

The School District of Philadelphia could fully implement Exhibit 'A', if so ordered, within two years of a court order, if adequate funds were made available by the Commonwealth or by a source other than the School District."

It thus appears that the evils which the abstention doctrine is designed to prevent are not manifest at this time, yet the possibility of causing irreparable harm by an indefinite postponement of an adjudication of a claim under the Civil Rights Acts, (and of pendent state claims) is both imminent and substantial. The proper exercise of our discretion is to deny the motion for abstention.

16. Compare *Burford v. Sun Oil, supra,* where Justice Black noted:

"[T]he Texas courts are working partners with the Railroad Commission in the business of creating a regulatory system for the oil industry." 319 U.S. at 326, 63 S.Ct. at 1103.

17. In an earlier prognosis, the plaintiffs implied that an adjudication of the level of services question would be difficult to avoid.

"The Commonwealth has refused to appropriate increased funds for special education of the learning disabled in Philadelphia public schools, thereby insuring that even if effective identification procedures are fully implemented, many children with learning disabilities will continue to be deprived of the specialized education they require." Memorandum at 25–26.