**Kathy STUART, by and through her mother and next friend, Joan Stuart, Plaintiffs,**

v.

**Pasquale NAPPI, Individually and in his capacity as Superintendent, Danbury Public Schools, Carl Susnitsky, Henrique Antonio, Paul Werner, Paul Baird, Theresa Boccuzzi, Bunny Jacobson, Tonio Pepe, Barbara Baker, Henry Bessel, Robert Jones, Individually and in their capacities as Members of the Danbury Board of Education, Defendants.**

Civ. No. B–77–381.

United States District Court, D. Connecticut.

Jan. 4, 1978.

Wenner A. Lohe, Jr., Danbury, Conn., John A. Dziamba, Willimantic, Conn., for plaintiffs.

Russell Lee Post, Jr., Avon, Conn., Robert W. Garvey, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

DALY, District Judge.

Plaintiff, Kathy Stuart[1], is in her third year at Danbury High School. The records kept by the Danbury School System concerning plaintiff tell of a student with serious academic and emotional difficulties. They describe her as having deficient academic skills caused by a complex of learning disabilities and limited intelligence. Not surprising, her record also reflects a history of behavioral problems. It was precisely for handicapped children such as plaintiff that Congress enacted the Education of the Handicapped Act (Handicapped Act), 20 U.S.C. § 1401 *et seq.* *See* 20 U.S.C. § 1401(1).

Plaintiff seeks a preliminary injunction of an expulsion hearing to be held by the Danbury Board of Education. She claims that she has been denied rights afforded her by the Handicapped Act. Her claims raise novel issues concerning the impact of recent regulations to the Handicapped Act on the disciplinary process of local schools.

The Handicapped Act was passed in 1970 and amended in 1975. Its purpose is to provide states with federal assistance for the education of handicapped children. *See* 45 C.F.R. § 121a at 374 (Appendix § 2.1) (1976). The regulations on which this decision turns became effective on October 1, 1977. *See* 42 Fed.Reg. 42,473 (1977) (to be codified in 45 C.F.R. § 121a). State eligibility for federal funding under the Handicapped Act is made contingent upon the implementation of a detailed state plan and upon compliance with certain procedural safeguards. *See* 20 U.S.C. §§ 1413, 1415. The state plan must require all public schools within the state to provide educational programs which meet the unique needs of handicapped children. *See Kruse v. Campbell*, 431 F.Supp. 180, 186 (E.D.Va.),

---

1. Pursuant to counsel's request, plaintiff is proceeding under a fictitious name. Those sections of the file reflecting her real name have been sealed from public inspection.

*vacated and remanded,* —— U.S. ——, ——, 98 S.Ct. 38, 54 L.Ed.2d 65 (October 4, 1977); *cf. Cuyahoga County Association For Retarded Children and Adults v. Essex,* 411 F.Supp. 46, 61 n. 7 (N.D.Ohio 1976). Connecticut's plan has been approved and the state presently receives federal funds. As a handicapped student in a recipient state, plaintiff is entitled to a special education program that is responsive to her needs and may insist on compliance with the procedural safeguards contained in the Handicapped Act. After scrutinizing the recent regulations to the Handicapped Act and reviewing both plaintiff's involved school record and the evidence introduced at the preliminary injunction hearing, this Court is persuaded that a preliminary injunction should issue.

The events leading to the present controversy began in 1975 when one of plaintiff's teachers reported to the school guidance counselor that plaintiff was "academically unable to achieve success in his class." As a result of this report and corroboration from her other teachers, it was suggested that plaintiff be given a psychological evaluation and that she be referred to a Planning and Placement Team (PPT). The members of a PPT are drawn from a variety of disciplines, but in all cases they are "professional personnel" employed by the local board of education.[2] The PPT's functions are to identify children requiring special education, to prescribe special education programs, and to evaluate these programs.

A meeting of the PPT was held in February of 1975, at which plaintiff was diagnosed as having a major learning disability. The PPT recommended that plaintiff be scheduled on a trial basis in the special education program for remediating learning disabilities and that she be given a psychological evaluation. Although the PPT report specifically stated that the psychological evaluation be given "at the earliest feasible time", no such evaluation was administered.

A second PPT meeting was held in May in order to give plaintiff the annual review mandated by Conn.Reg. § 10–76b–7(b). The PPT reported plaintiff had made encouraging gains, but she suffered from poor learning behaviors and emotional difficulties. A psychological evaluation was again recommended. Her continued participation in the special educational program was also advised, but it was made contingent upon the results of the psychological evaluation.

When school commenced in September of 1975, the PPT requested an immediate psychological evaluation. The PPT stated that an evaluation was essential in order to develop an appropriate special education program. For reasons which have not been explained to the Court, the psychological evaluation was not administered for some time, and the clinical psychologist's report of the evaluation was not completed until January 22, 1976. The report stated that plaintiff had severe learning disabilities derived from either a minimal brain dsyfunction or an organically rooted perceptual disorder. It recommended her continued participation in the special education program and concluded: "I can only imagine that someone with such deficit and lack of development must feel utterly lost and humiliated at this point in adolescence in a public school where other students . . . are performing in such contrast to her." The report of plaintiff's psychological evaluation was reviewed at a March, 1976 PPT meeting. The PPT noted that plaintiff was responding remarkably well to the intensive one-to-one teaching she received in the special education program, and recommended that she continue the program until the close of the 1975–1976 school year.

The first indication that the special education program was no longer appropriate came in May of 1976. At that time plaintiff's special education teacher reported that plaintiff had all but stopped attending the program. The teacher requested a PPT meeting to consider whether plaintiff's primary handicap was an emotional disability

---

**2.** The PPT is defined in Conn.Reg. § 10–76b–1(q) as "The group of persons chosen from the teaching, administrative and pupil personnel staff of the school district . . . ."

rather than a learning disability. Despite this request, plaintiff's schedule was not changed nor was a PPT meeting held to review her program before the close of the school year.

At the beginning of the 1976–1977 school year, plaintiff was scheduled to participate in a learning disability program on a part-time basis. Her attendance continued to decline throughout the first half of the school year. By late fall she had completely stopped attending her special education classes and had begun to spend this time wandering the school corridors with her friends. Although she was encouraged to participate in the special education classes, the PPT meeting concerning plaintiff's program, which had been requested at the end of the previous school year, was not conducted in the fall of 1976.

In December of 1976 plaintiff was involved in several incidents which resulted in a series of disciplinary conferences between her mother and school authorities. These conferences were followed by a temporary improvement in plaintiff's attendance and behavior. In light of these improvements, the annual PPT review held in March of 1977 concluded that plaintiff should continue to participate in the special education program on a part-time basis for the remaining three months of the school year. The PPT also recommended that in the next school year plaintiff be scheduled for daily special education classes and that she be considered for a special education vocational training program. The PPT report stated that it was of primary importance for plaintiff to be given a program of study in the 1977–1978 school year which was based on a realistic assessment of her abilities and interests.

Despite the PPT recommendation, plaintiff has not been attending any learning disability program this school year. It is unclear whether this resulted from the school's failure to schedule plaintiff properly or from plaintiff's refusal to attend the program. Regardless of the reason, the school authorities were on notice in the early part of September that the program prescribed by the PPT in March of 1977 was not being administered. In fact, a member of the school staff who was familiar with plaintiff requested that a new PPT review be conducted. This review has never been undertaken.

On September 14, 1977 plaintiff was involved in school-wide disturbances which erupted at Danbury High School. As a result of her complicity in these disturbances, she received a ten-day disciplinary suspension and was scheduled to appear at a disciplinary hearing on November 30, 1977. The Superintendent of Danbury Schools recommended to the Danbury Board of Education that plaintiff be expelled for the remainder of the 1977–1978 school year at this hearing.

Plaintiff's counsel made a written request on November 16, 1977 to the Danbury Board of Education for a hearing and a review of plaintiff's special education program in accordance with Conn.Gen.Stat. § 10–76h. On November 29, 1977 plaintiff obtained a temporary restraining order from this Court which enjoined the defendants from conducting the disciplinary hearing. This order was continued on December 12, 1977 at the conclusion of the preliminary injunction hearing. Between the time the first temporary restraining order was issued and the preliminary injunction hearing was held plaintiff was given a psychological evaluation. However, the results of this evaluation were unavailable at the time of the hearing. A PPT review of plaintiff's program has not been conducted since March of 1977, nor has the school developed a new special education program for plaintiff. Furthermore, there was no showing at the hearing that plaintiff's attendance at Danbury High School would endanger her or others.

■ Plaintiff is entitled to a preliminary injunction enjoining Danbury Board of Education from conducting a hearing to expel her. The standard which governs the issuance of a preliminary injunction is well-settled. Plaintiff must demonstrate either (1) probable success on the merits of her claim and possible irreparable injury, or (2)

sufficiently serious questions going to the merits of her claim and a balance of hardship tipping decidedly in her favor. *Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1358 (2d Cir. 1976); *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973); *City of Hartford v. Hills,* 408 F.Supp. 879, 882 (D.Conn.1975). In *Triebwasser supra* at 1359 the Second Circuit stated that a demonstration of possible irreparable harm is required under both of these alternatives.

■ Plaintiff has made a persuasive showing of possible irreparable injury. It is important to note that the issuance of a preliminary injunction is contingent upon *possible* injury. The irreparable injuries claimed by plaintiff are those which will result from her expulsion at the Board of Education hearing. In this situation the Court must assume that she will, in fact, be expelled, and then proceed to consider the probable consequences of her expulsion. If plaintiff is expelled, she will be without any educational program from the date of her expulsion until such time as another PPT review is held and an appropriate educational program is developed. In light of past delays in the administration of plaintiff's special education program, the Court is concerned that some time may pass before plaintiff is afforded the special education to which she is entitled. However, even assuming her new program is developed with dispatch, for a period of time plaintiff will suffer the injury inherent in being without any educational program. The second irreparable injury to which plaintiff will be subjected derives from the fact that her expulsion will preclude her from taking part in any special education programs offered at Danbury High School. If plaintiff is expelled, she will be restricted to placement in a private school or to homebound tutoring. Regardless of whether these two alternatives are responsive to plaintiff's needs, the PPT will be limited to their use in fashioning a new special education program for plaintiff. Of particular concern to the Court is the possibility that an appropriate private placement will be unavailable and plaintiff's education will be reduced to some type of homebound tutoring. Such a result can only serve to hinder plaintiff's social development and to perpetuate the vicious cycle in which she is caught. *See Hairston v. Drosick,* 423 F.Supp. 180, 183 (S.D.W.Va.1973) (holding that it is "imperative that every child receive an education with his or her peers insofar as it is at all possible"). The Court is persuaded that plaintiff's expulsion would have been accompanied by a very real possibility of irreparable injury.

■ Plaintiff has also demonstrated probable success on the merits of four federal claims.[3] The Handicapped Act and the regulations thereunder detail specific rights to which handicapped children are entitled. Among these rights are: (1) the right to an "appropriate public education"; (2) the right to remain in her present placement until the resolution of her special education complaint; (3) the right to an education in the "least restrictive environment"; and (4) the right to have all changes of placement effectuated in accordance with prescribed procedures. Plaintiff claims she has been or will be denied these rights.

Plaintiff argues with no little force that she has been denied her right to an "appropriate public education." The meaning of this term is clarified in the definitional section of the Handicapped Act. Essentially, it is defined so as to require Danbury High

3. Plaintiff makes an intriguing state claim that her expulsion contravenes Conn.Gen.Stat. §§ 10–233d, 4–177. This claim is based on the argument that plaintiff is entitled to a current psychological evaluation and a PPT determination of the adequacy of her special education placement prior to an expulsion hearing. The thrust of this argument is that without a current evaluation and PPT determination plaintiff is being denied a meaningful opportunity "to present evidence and argument on all issues involved" as required by Conn.Gen.Stat. § 4–177(c). This is exclusively a state claim and a state court should rule on it in the first instance. *Cf. Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1940). Until such time as a state court has clarified the meaning of Conn.Gen.Stat. § 4–177, this Court will decline to exercise its discretionary, pendent jurisdiction over this claim.

School to provide plaintiff with an educational program specially designed to meet her learning disabilities. *See* 20 U.S.C. § 1401(1), (15)–(19). The record before this Court suggests that plaintiff has not been provided with an appropriate education. Evidence has been introduced which shows that Danbury High School not only failed to provide plaintiff with the special education program recommended by the PPT in March of 1977, but that the high school neglected to respond adequately when it learned plaintiff was no longer participating in the special education program it had provided. The Court cannot disregard the possibility that Danbury High School's handling of plaintiff may have contributed to her disruptive behavior. The existence of a causal relationship between plaintiff's academic program and her anti-social behavior was supported by expert testimony introduced at the preliminary injunction hearing. *Cf. Frederick v. Thomas*, 408 F.Supp. 832, 835 (E.D.Pa.1976) (argument that inappropriate educational placement caused anti-social behavior is raised). If a subsequent PPT were to conclude that plaintiff has not been given an appropriate special education placement, then the defendant's resort to its disciplinary process is unjustifiable. The Court is not making a final determination of whether plaintiff has been afforded an appropriate education. The resolution of this question is beyond the scope of the present inquiry. In order to sustain a preliminary injunction plaintiff need only demonstrate probable success on the merits of her claim. She has satisfied this standard.

Plaintiff also claims that her expulsion prior to the resolution of her special education complaint would be in violation of 20 U.S.C. § 1415(e)(3).[4] This subsection of the Handicapped Act states: "During the pendency of any proceedings conducted pursuant to this section, unless the state or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child . . . until all such proceedings have been completed." Plaintiff qualifies for the protection that this subsection provides. She has filed a complaint pursuant to 20 U.S.C. § 1415(b)(1)(E) requesting a hearing and a review of her special education placement. Moreover, there has been no agreement to leave her present special education placement voluntarily. Thus, plaintiff has a right to remain in this placement until her complaint is resolved. The novel issue raised by plaintiff arises from the fact that the right to remain in her present placement directly conflicts with Danbury High Schools's disciplinary process. If the high school expels plaintiff during the pendency of her special education complaint, then her placement will be changed in contravention of 20 U.S.C. § 1415(e)(3). The Court must determine whether this subsection of the Handicapped Act prohibits the expulsion of handicapped children during the pendency of a special education complaint.

■ This is a case of first impression. Although there are no decisions in which the relation between the special education processes and disciplinary procedures is discussed, the regulations promulgated under the new law are helpful. The Department of Health, Education and Welfare (HEW) released regulations in August of this year that are aimed at facilitating the implementation of the Handicapped Act. *See* 42 Fed.Reg. 42,473 (1977) (to be codified in 45

---

4. The terms "suspension" and "expulsion" are used in accordance with the definitions appearing in Conn.Gen.Stat. § 10–233a(c), (d):

(c) Suspension means an exclusion from school privileges for no more than ten consecutive school days, provided such exclusion shall not extend beyond the end of the school year in which such suspension was imposed.

(d) Expulsion means an exclusion from school privileges for more than ten consecutive days and shall be deemed to include, but not be limited to, exclusion from the school to which such pupil was assigned at the time such disciplinary action was taken, provided such exclusion shall not extend beyond the end of the school year in which such exclusion was imposed.

This decision in no way affects the "removal" of students for all or part of a single class period. *See* Conn.Gen.Stat. § 10–233a(b).

C.F.R. § 121a). Contained therein is a comment addressing the conflict between 20 U.S.C. § 1415(e)(3) and the disciplinary procedures of public schools. The comment reiterates the rule that after a complaint proceeding has been initiated, a change in a child's placement is prohibited. It then states: "While the placement may not be changed, this does not preclude a school from using its normal procedures for dealing with children who are endangering themselves or others." 42 Fed.Reg. 42,473, 42,496 (1977) (to be codified in 42 C.F.R. § 121a.513). This somewhat cryptic statement suggests that subsection 1415(e)(3) prohibits disciplinary measures which have the effect of changing a child's placement, while permitting the type of procedures necessary for dealing with a student who appears to be dangerous. This interpretation is supported by a comment-to-the-comment which states that the comment was added to make it clear that schools are permitted to use their regular procedures for dealing with emergencies.[5] See 42 Fed. Reg. 42,473, 42,512 (1977) (to follow the codification at 45 C.F.R. § 121a.513). There is no indication in either the regulations or the comments thereto that schools should be permitted to expel a handicapped child while a special education complaint is pending.

The Court concurs with HEW's reading of subsection 1415(e)(3). As will be discussed, the Handicapped Act establishes procedures which replace expulsion as a means of removing handicapped children from school if they become disruptive. Furthermore, school authorities can deal with emergencies by suspending handicapped children. Suspension will permit the child to remain in his or her present placement, but will allow schools in Connecticut to exclude a student for up to ten consecutive school days. See Conn.Gen. Stat. § 10-233a(c) and note 3 supra. Therefore, plaintiff's expulsion prior to the resolution of her complaint would violate the Handicapped Act.

Plaintiff makes a third claim that the Handicapped Act prohibits her expulsion even after her complaint proceedings have terminated. She bases this claim on her right to an education in the "least restrictive environment" and on the overall design of the Handicapped Act. An important feature of the Handicapped Act is its requirement that children be educated in the "least restrictive environment." This requirement entitles handicapped children to be educated with nonhandicapped children whenever possible. See 20 U.S.C. § 1412(5)(B); 42 Fed.Reg. 42,473, 42,497, 42,513 (1977) (to be codified in 45 C.F.R. § 121a.550). The right of handicapped children to an education in the "least restrictive environment" is implemented, in part, by requiring schools to provide a continuum of alternative placements. See 20 U.S.C. § 1412(5)(B); 42 Fed.Reg. 42,473, 42,497 (1977) (to be codified in 45 C.F.R. § 121a.551). These alternatives include instruction in regular classes, special classes, private schools, the child's home and other institutions. By providing handicapped children with a range of placements, the Handicapped Act attempts to insure that each child receives an education which is responsive to his or her individual needs while maximizing the child's opportunity to learn with nonhandicapped peers. See 42 Fed.Reg. 42,473, 42,497 (1977) (to be codified in 45 C.F.R. § 121a.552).

The right to an education in the least restrictive environment may be circumvented if schools are permitted to expel handicapped children. An expulsion has the ef-

---

**5.** The complete text of the comment-to-the-comment states:

> Commenters suggested a provision be added to allow change of placement for health or safety reasons. One Commenter requested that the regulations indicate that suspension not be considered a change in placement. Another commenter wanted more specificity to make it clear that where an initial placement is involved, the child be placed in the regular education program or if the parents agree, in an interim special placement.
>
> Response: A comment has been added to make it clear that this section would not preclude a public agency from using its regular procedures for dealing with emergencies. 42 Fed.Reg. 42,473, 42,512 (1977) (to follow codification at 45 C.F.R. § 121a.513).

fect not only of changing a student's placement, but also of restricting the availability of alternative placements. For example, plaintiff's expulsion may well exclude her from a placement that is appropriate for her academic and social development. This result flies in the face of the explicit mandate of the Handicapped Act which requires that all placement decisions be made in conformity with a child's right to an education in the least restrictive environment. *See* 42 Fed.Reg. 42,473, 42,497 (1977) (to be codified in 45 C.F.R. § 121a.533(a)(4)).

■ The expulsion of handicapped children not only jeopardizes their right to an education in the least restrictive environment, but is inconsistent with the procedures established by the Handicapped Act for changing the placement of disruptive children. The Handicapped Act prescribes a procedure whereby disruptive children are transferred to more restrictive placements when their behavior significantly impairs the education of other children. *See* 42 Fed.Reg. 42,473, 42,497 (1977) (to be codified in 45 C.F.R. § 121a.552).[6] The responsibility for changing a handicapped child's placement is allocated to professional teams, such as Connecticut's PPTs. *See* 42 Fed.Reg. 42,473, 42,497 (1977) (to be codified in 45 C.F.R. § 121a.533(a)(3)). Furthermore, parents of handicapped children are entitled to participate in and to appeal from these placement decisions. *See* 42 Fed.Reg. 42,473, 42,490 (1977) (to be codified in 45 C.F.R. § 121a.345); 20 U.S.C. § 1415(b)(1)(C), (c). Thus, the use of expulsion proceedings as a means of changing the placement of a disruptive handicapped child contravenes the procedures of the Handicapped Act. After considerable reflection the Court is persuaded that any changes in plaintiff's placement must be made by a PPT after considering the range of available placements and plaintiff's particular needs.

■ It is important that the parameters of this decision are clear. This Court is cognizant of the need for school officials to be vested with ample authority and discretion. It is, therefore, with great reluctance that the Court has intervened in the disciplinary process of Danbury High School. However, this intervention is of a limited nature. Handicapped children are neither immune from a school's disciplinary process nor are they entitled to participate in programs when their behavior impairs the education of other children in the program. First, school authorities can take swift disciplinary measures, such as suspension, against disruptive handicapped children. Secondly, a PPT can request a change in the placement of handicapped children who have demonstrated that their present placement is inappropriate by disrupting the education of other children. The Handicapped Act thereby affords schools with both short-term and long-term methods of dealing with handicapped children who are behavioral problems.

■ Defendants contend that their disciplinary procedures are beyond the purview of this Court. They are mistaken. It has long been fundamental to our federalism that public education is under the control of state and local authorities. *See Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Buck v. Board of Education of City of New York*, 553 F.2d 315, 320 (2d Cir. 1977). Although there is little doubt that the judgment of state and local school authorities is entitled to considerable deference, it is equally clear that even a school's disciplinary procedures are subject to the scrutiny of the federal judiciary. *See e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974); *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Board of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1942). *Cf. Yoo v. Moynihan*, 28 Conn.Sup. 375, 262 A.2d 814 (1969) (temporary injunction issued by state

6. The comment to 45 C.F.R. § 121a.552 explains that a handicapped child's placement is inappropriate whenever the child becomes so disruptive that the "education of other students is significantly impaired." This explanation is derived from a comment to the Rehabilitation Act of 1973, 29 U.S.C. § 794. *See* 42 Fed.Reg. 22,676, 22,691 (1977) (to follow codification in 45 C.F.R. § 84.34).

court against expulsion of student for violation of dress code). In the instant case, judicial intervention in Danbury High School's disciplinary procedures is Congressionally mandated. The Handicapped Act vests jurisdiction in federal district courts over all claims of noncompliance with the Act's procedural safeguards, regardless of the amount in controversy. *See* 20 U.S.C. § 1415(e)(4).

Defendants' principle objection to the issuance of a preliminary injunction is that the procedures for securing a special education are distinct from disciplinary procedures and therefore one process should not interfere with the other. This contention is based on a non sequitur. The inference that the special education and disciplinary procedures cannot conflict, does not follow from the premise that these are separate processes. Defendants are really asking the Court to refuse to resolve an obvious conflict between these procedures. This Court will not oblige them.

Danbury Board of Education is HEREBY ORDERED to require an immediate PPT review of plaintiff's special education program and is preliminarily enjoined from conducting a hearing to expel her. Furthermore, any changes in her placement must be effectuated through the proper special education procedures until the final resolution of plaintiff's claims.