Evelyn FITZGERALD et al.,
Plaintiffs-Appellants,

v.

PORTER MEMORIAL HOSPITAL et al., Defendants-Appellees.

No. 74–1949.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1975.

Decided Sept. 26, 1975.

Rehearing En Banc Denied Nov. 21, 1975.

---

Judith M. Mears, American Civ. Liberties Union, New York City, Seymour Moskowitz, Gary, Ind., Ivan E. Bodensteiner, Valparaiso, Ind., Linda Georgeson and Marcia Soules, Law Students, for plaintiffs-appellants.

Daniel M. Schuyler, Chicago, Ill., Roger K. Claudon, Valparaiso, Ind., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

This appeal presents the question whether a mother, her husband, or their doctor has a constitutional right to have the father present during the birth of a child.

Porter Memorial Hospital, a public hospital, maintains and enforces a policy "prohibiting the presence of any person or persons in the Delivery Rooms located in the Obstetrics Ward other than members of the Medical Staff and Nursing Staff." [1] Plaintiffs are married couples who have completed training courses in the psychoprophylactic or La-Maze method of childbirth. [2] At the time of the filing of the complaint herein, each couple but one was either expecting the birth of a child or had recently given birth at Porter Memorial Hospital. [3] In

---

**1.** Affidavit of Administrator Arthur S. Malasto, see n.6, infra.

**2.** As plaintiffs explained in their brief to this court,

"This method requires a serious commitment on the part of those participating. Husbands and wives must attend a series of classes that include lectures, films, question and answer periods, instruction in controlled breathing and relaxation techniques; and

discussions on various pregnancy-related topics. This advance preparation and training serve to prepare the couples for the events that take place during pregnancy, labor and delivery, and enable them to function as a team during labor and delivery, with the husband supplying physical and emotional support to his wife."

**3.** Although all of the plaintiffs have had their children, the case is not moot. In *Roe v.*

each case, the Hospital had either indicated that, pursuant to the above-quoted policy, it would not permit the husband to be present in the delivery room or actually prevented the husband from participating in the delivery. Plaintiffs brought suit against the Hospital, the members of the board of directors and the Hospital administrator under 42 U.S.C. § 1983 [4] and the First, Fourth, Ninth, and Fourteenth Amendments to the Constitution,[5] on behalf of themselves and other similarly-situated persons, challenging the constitutionality of the Hospital's policy and seeking injunctive and declaratory relief and damages.

The district court held a hearing on plaintiffs' application for a temporary restraining order at which the plaintiffs

introduced the testimony of one physician and the affidavits and letters of others explaining the LaMaze birth method and its benefits for both mother and child. Defendants countered with the affidavit of defendant Malasto, Hospital Administrator, wherein he explained that the Hospital had recently considered, but rejected, a change in the exclusionary policy and set forth reasons for continuing the rule.[6] Motions to dismiss both the complaint for failure to state a claim and the petition for a temporary restraining order were filed.

■ On September 10, 1974, the district court, in an unreported memorandum opinion and order granted the motion to dismiss.[7] No ruling was rendered

---

*Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147, the Supreme Court indicated that, because of its brief time span, "Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of repetition yet evading review.' "

4. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Jurisdiction was claimed under 28 U.S.C. § 1343(3). There is no dispute that Porter Memorial Hospital is a public hospital and that its actions are "under color of state law" within the meaning of § 1983.

5. The Complaint stated as an alternative basis of jurisdiction 28 U.S.C. § 1331. The requisite amount in controversy was alleged.

6. Malasto stated:

"That among the rules and regulations of Porter Memorial Hospital is one prohibiting the presence of any person or persons in the Delivery Rooms located in the Obstetrics Ward other than members of the Medical Staff and Nursing Staff. That on June 25, 1974, the Medical Staff considered the adoption of a recommendation to the Board of Trustees to change the foregoing prohibition by allowing the attendance of the spouses in the rooms where their wives were giving birth. This recommendation was rejected by the Medical Staff in its meeting on said date.

"The Board of Trustees, in its meeting held on July 9, 1974, resolved to continue the policy of not permitting fathers in the delivery room at any time.

"That the Obstetrics Ward in Porter Memorial Hospital contains labor rooms, recovering room, nurses' station and obstetrics lounge in addition to the delivery rooms. That ingress and egress to the various rooms is afforded by corridors. That there is a common corridor serving the three (3) Delivery Rooms. That there are no private entrances to any of the three (3) Delivery Rooms except through the aforementioned corridor. That expectant mothers are removed from labor rooms to the said delivery rooms when birth is imminent. That these patients are open to view to persons using the corridor serving the said three (3) delivery rooms. That the said corridor is off-limits to all persons other than attending physicians and members of the Nursing Staff and obstetrics patients.

"A diagram showing the corridor and its adjoining rooms is attached hereto and made a part hereof and labeled Exhibit 1.

"That there are presently no facilities in the Obstetrics Ward for changing rooms for any of the persons except members of the medical Staff and Nursing Staff."

7. The Court found that it had jurisdiction under 28 U.S.C. § 1343(3). There was no discussion of whether the Hospital is a "municipal corporation" within the meaning of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, and *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109, and, thus, immune to suit under § 1983. Clearly the individual defendants could be sued under that provision, however, and it appears the action

on the request for certification of the suit as a class action. The court found that the Hospital was not denying the plaintiffs access to its facilities or totally prohibiting a medically approved operation and that plaintiffs did not have standing to assert the rights of their physicians. From this order plaintiffs appeal.[8]

## I.

Plaintiffs characterize the right they assert as an aspect of the "right of marital privacy." The source of its constitutional protection is either the so-called penumbra of various provisions of the Bill of Rights[9] or the word "liberty" in the Due Process Clause of the Fourteenth Amendment.[10]

It is somewhat unfortunate that claims of this kind tend to be classified as assertions of a right to privacy. For the group of cases that lend support to plaintiffs' position do not rest on the same privacy concept that Brandeis and Warren identified in their article in the 1890 Edition of the Harvard Law Review.[11] These cases do not deal with the individual's interest in protection from unwarranted public attention, comment, or exploitation. They deal, rather, with the individual's right to make certain unusually important decisions that will affect his own, or his family's, destiny. The Court has referred to such decisions as implicating "basic values,"[12] as being "fundamental,"[13] and as being dignified by history and tradition.[14] The character

could be maintained against the Hospital directly under the Fourteenth Amendment, via 28 U.S.C. § 1331. *See Calvin v. Conlisk,* 520 F.2d 1 at 8 (7th Cir. 1975); *Hostrop v. Bd. of Junior College District No. 515,* 523 F.2d 569 at 577 (7th Cir. 1975).

8. Defendants argue initially that the district court order must be affirmed because plaintiffs have failed to allege an essential precondition to the right they seek to assert, "the right to have fathers present at the birth of their children if said Plaintiffs have the consent of the attending physician." (Complaint, para. X.5). As defendants point out, nowhere in the complaint do plaintiffs specifically allege that their physicians had, or would have, consented but for the policy of the Hospital, to the presence of the fathers in the delivery room. Thus, they argue that it would be inappropriate for us to reach the constitutional question presented herein.

We think a fair reading of the complaint indicates, however, that it is the policy of Porter Memorial Hospital and not any hesitancy on the part of plaintiffs' doctors which has prevented the husbands from being present in the delivery room. In subparagraphs 18(c) and (d) it is alleged that plaintiffs Bruce Fitzgerald and Michael Greener were so excluded from the delivery room at the time of the birth of their children. Moreover, in subparagraph 18(e), plaintiffs allege that the Obstetrical Committee of the Hospital had voted to permit plaintiff Geoffrey Scott to be present in the delivery room during the birth of his child. While this recommendation was later rejected by the Hospital staff and Board of Trustees, it is clear that there were qualified obstetricians who would have delivered the Scott baby at Porter Memorial in the father's presence. Thus, we conclude that the constitutionality of

the Hospital's policy is squarely presented by this case and is ripe for resolution at this time.

9. See *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510.

10. See *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147.

11. Warren & Brandeis, "The Right to Privacy", 4 Harv.L.Rev. 193 (1890).

12. "In my view, the proper constitutional inquiry in this case is whether this Connecticut statute infringes the Due Process Clause of the Fourteenth Amendment because the enactment violates basic values 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325 [58 S.Ct. 149, 82 L.Ed. 288]." *Griswold v. Connecticut,* 381 U.S. 479, 500, 85 S.Ct. 1678, 1690, 14 L.Ed.2d 510 (Harlan, J., concurring).

13. "These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' *Palko v. Connecticut,* 302 U.S. 319, 325 [58 S.Ct. 149, 82 L.Ed. 288] (1937), are included in this guarantee of personal privacy." *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147.

"The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments." *Griswold v. Connecticut,* 381 U.S. 479, 488, 85 S.Ct. 1678, 1684, 14 L.Ed.2d 510 (Goldberg, J., concurring).

14. "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system."

of the Court's language in these cases brings to mind the origins of the American heritage of freedom—the abiding interest in individual liberty that makes certain state intrusions on the citizen's right to decide how he will live his own life intolerable.[15] Guided by history, our tradition of respect for the dignity of individual choice in matters of conscience and the restraints implicit in the federal system, federal judges have accepted the responsibility for recognition and protection of these rights in appropriate cases. But can it fairly be said that this is such a case?

As we understand plaintiffs' argument, there are three aspects of their asserted right that make it worthy of constitutional protection. It arises out of the marital relationship; the birth of a child is an extremely important event; in their judgment, and in the judgment of a respectable segment of the medical profession, the LaMaze procedure is safe and, indeed, a more beneficial obstetrical procedure than traditional practices which deny the father the right to be present when the delivery takes place in a hospital. Neither individually nor collectively do these facts justify judicial review of the rule which has been adopted by the professional staff of the defendant hospital.

Although plaintiffs' claim is advanced only in the name of "marital privacy," we are persuaded that, if valid, it could be asserted with equal force by unwed parents and perhaps also by other persons about to undergo serious medical procedures.[16] Respect for the private aspects of the institution of marriage were heavily emphasized in Justice Douglas' opinion for the Court in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. But neither the conception that produced *Griswold,* nor its progeny, is narrowly limited to marital rights. For Justice Douglas drew support for the Court's holdings from its earlier recognition of the parents' right to educate their children in schools of their choice,[17] the right to study the German language,[18] and the right to select one's associates.[19] And the *Griswold* holding that husband and wife may decide whether or not to use contraceptives has subsequently been extended to accord a comparable right to unmarried individuals.[20] Finally, the constitutional protection given to the pregnant woman's right to decide whether or not to bear her child is clearly not dependent on re-

> *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510.
>
> "Judicial self-restraint will not, I suggest, be brought about in the 'due process' area by the historically unfounded incorporation formula advanced by my Brother Black, and now in part espoused by my Brother Stewart. It will be achieved in this area, as in other constitutional areas, only by continual insistence upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms." 381 U.S. 479, 501, 85 S.Ct. 1678, 1691, 14 L.Ed.2d 510 (Harlan, J., concurring).

15. "If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349.

16. If the right plaintiffs assert does exist, surely it is not confined to the husband and wife. An unwed mother may have the same need for emotional support, and the same interest in a superior medical procedure, as a wife. Indeed, any patient about to undergo serious surgery might also assert a constitutionally protected interest in the companionship of his choice during the time of stress, or, indeed, in the surgical procedure of his choice. Plaintiffs make no such expansive claim, but a fair analysis of their position requires concern about the consequences of adopting the rule they espouse.

17. *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070.

18. *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042.

19. *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488.

20. *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349.

spect for the institution of marriage; it respects the individual's interest in a decision which, by any standard, is certainly of fundamental importance and implicates basic values.

Plaintiffs ask us to hold that their decision to use the LaMaze method of child birth is entitled to equal respect and may not be frustrated by a public hospital's rule.

The birth of a child is an event of unequalled importance in the lives of most married couples. But deciding the question whether the child shall be born is of a different magnitude from deciding where, by whom, and by what method he or she shall be delivered. In its medical aspects, the obstetrical procedure is comparable to other serious hospital procedures. We are not persuaded that the married partners' special interest in their child gives them any greater right to determine the procedure to be followed at birth than that possessed by other individuals in need of extraordinary medical assistance.

Plaintiffs do not contend that they have a right to have the husband present without the consent of the attending physician. Implicitly, therefore, they acknowledge that their asserted right is subordinate to the dictates of sound medical practice. Having implicitly admitted that individual doctors may find valid medical reasons for excluding the father in individual cases, they must equally recognize that hospitals may also assume that the number of cases in which exclusion is appropriate is sufficiently large to justify the development of facilities and procedures in which the presence of the husband would be objectionable.[21] More importantly, the valid medical reasons for exclusion in individual cases requires us equally to recognize that the dispute within the medical profession as to the propriety and safety of permitting the husband to be present during the routine birth[22] is not one that should be resolved by substituting our judgment for the professional judgment of the staff of defendant hospital.

■ We hold that the so-called right of marital privacy does not include the right of either spouse to have the husband present in the delivery room of a public hospital which, for medical reasons, has adopted a rule requiring his exclusion.

## II.

■ Plaintiffs also argue that the hospital rule improperly restricts the rights of their physicians to practice medicine.[23]

21. Administrator Malasto's affidavit states that permitting fathers to be present in the delivery room would, given the physical set-up at the hospital, result in a loss of privacy for other patients about to give birth.

22. *Compare* J. Morton, "Fathers in the Delivery Room—an Opposition Standpoint," Hospital Topics 103 (Jan. 1966); S. Olds & L. Witt, "New Man in the Delivery Room—the Father," Today's Health 52 (Oct. 1970); N. Sehgal, "The Potential for Problems when Husbands are in the Delivery Room," Resident and Staff Physician 33 (March, 1973); C. Shu, Husband-Father in Delivery Room," Hospitals, J.A.H.A. 90 (Sept. 17, 1973), *with e. g.,* Int'l Childbirth Education Association, "Husbands in the Delivery Room" (1971)

It appears that all parties are in accord that medical reasons were raised by the Hospital in refusing to change its policy. As plaintiffs themselves informed the district court in their Brief in Support of Plaintiffs' Motion for Temporary Restraining Order, at 4, testimony at trial would show that:

"By public statement the Hospital put forth three reasons for its policy excluding fathers from the delivery room, to-wit: (1) the increased danger of infection and/or sepsis from the introduction of a non-medical person (2) the increased danger of disruption and interference with delivery room routine by a non-medical person and (3) there is no place for fathers to change from street-clothes into delivery room uniform."

Since it is the existence of a bona fide medical dispute, rather than the appropriate resolution of that dispute, which concerns us, no purpose would be served by remanding the case to the district court for a hearing.

23. The district court did not reach this contention, for it was found that the plaintiffs did not possess the requisite standing to assert the right of the absent doctors. The district court relied on the fact that any doctor could assert his rights to practice without restriction, citing *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586. Recent decisions of the Court suggest, however, that whenever one

They rely on *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, and other cases invalidating hospital rules which placed greater restrictions on the performance of abortions than on comparable medical procedures. Those rules impaired the exercise of a right which the Court had held entitled to constitutional protection. We have rejected the claim that the right asserted by plaintiffs in this case is entitled to such protection, and there is no claim that the hospital's exclusionary rule discriminates against obstetrical procedures as opposed to other operations. The argument advanced by plaintiffs when standing in their doctors' shoes is no stronger than their own. We are moved, but not persuaded, by their own interest in companionship and moral support; we are unmoved, and certainly unpersuaded, by the argument that the rule is an unconstitutional impairment of the doctors' right to practice medicine free of unreasonable governmental restraint. Since, as we have already noted, there is a difference of opinion within the profession as to the desirability of such a rule, this is a classic example of the kind of situation in which individual hospitals should be permitted to make individual choices, rather than having an inflexible rule imposed upon all hospitals in the nation by federal judicial decision.

Affirmed.

SPRECHER, Circuit Judge (dissenting).

Although I concur in Judge Stevens' disposition of the jurisdictional, mootness and standing issues and I have no quar-

party to a confidential professional relationship asserts injury to himself and to the rights of the other party to such a relationship, he may assert the rights of the absent partner. As the Court explained in *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510,

"The rights of husband and wife, pressed here, are likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to them."

*Cf. Eisenstadt v. Baird,* 405 U.S. 438, 443–446, 92 S.Ct. 1029, 31 L.Ed.2d 349; *Friendship*

rel with his general discussion of the right to privacy, I dissent completely from his conclusion that the right to privacy does not include the right of expectant parents to have the male present with the female in the delivery room of a public hospital in cases where the attending physician has consented to that procedure.

Although the plaintiffs pray on appeal "that this court should reverse on the standing issue and remand the case to the district court for a trial on the merits," Judge Stevens has bowed to the expertise of the medical profession without the benefit of an evidentiary hearing. Nevertheless, the record before us includes uncontradicted evidence that under the LaMaze method of childbirth "in the more than 45,000 cases collected in . . . surveys, there was not one infection traceable to the practice and not one malpractice suit."

The plaintiffs also submitted the affidavit of a Clinical Professor of Obstetrics and Gynecology at the University of Chicago School of Medicine who stated that he has delivered approximately one thousand babies in the past four years with the fathers present in the delivery room and it is his opinion:

■ That . . . the presence of the father during the delivery of the infant is beneficial to the mother, the father, the infant and himself;

■ That the father's presence in the delivery room has an extremely stabilizing effect on the mother, thereby aiding her in the second stage of labor (delivery);

*Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141, 1145–1148 (7th Cir. 1974). *See generally* R. Sedler, "Standing to Assert Constitutional Jus Tertii in the Supreme Court," 71 Yale L.J. 599 (1962); Comment, "Standing to Assert Constitutional Jus Tertii," 88 Harv.L.Rev. 423 (1974).

We need not decide whether the district court erred in this respect, for we are convinced that, even if they do have standing to raise the claims of their doctors, the adoption of this policy has not violated these rights.

■ That the mother's cooperation during the second stage of labor helps to enable her to deliver the baby sooner and more safely because she will be calmer, and thus able to bear down more intensively, thus shortening this stage of labor;

■ That because of this shortened labor, the newborn will have increased probability of a healthy birth and a decreased probability of hypoxia (insufficient oxygen);

■ That the father's presence in the delivery room does not create a need for additional personnel in the delivery room, and that in fact, no greater number of hospital personnel are in attendance when the father is present than when he is not;

■ That there have been no serious incidents attributable to the presence of the father in the delivery room in my experience;

■ That I have found no evidence in current obstetrical literature indicating that the presence of husbands in the delivery room (assuming proper safeguards are taken) would be hazardous and in fact the most comprehensive study to date on the subject, published by the International Childbirth Education Association in 1968, reported that out of 45,050 husband attended deliveries there were no cases of puerperal infection traceable to the practice.

The cases establishing fundamental familial and procreative rights are pertinent: *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (parents have right that children study German language); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (parents have right to direct education of children); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (person has right not to be compulsorily sterilized); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (married persons have right to use contraceptives); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct.

1817, 18 L.Ed.2d 1010 (1967) (black and white persons have right to marry each other); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (unmarried persons have right to use contraceptives); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (unmarried father has custodial rights to his child); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (person has right to procure abortion at certain times and under certain circumstances).

Mr. Justice Cardozo believed that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body . . . ." *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914). Consequently, the informed consent of the patient is necessary before the doctor deals with the patient's body. *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 464 F.2d 772 (1972), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

In the present case the patients have expressed their desire for a particular form of childbirth which is safe and sanitary for mother and child and imposes a minimum burden on the hospital. The patients' doctors are willing to perform childbirth in the desired way and in fact the patients' claim is conditioned upon the consent of the attending physician, yet the patients' desires as to the manner in which they wish their bodies dealt with has been frustrated by rejection of the method by "the Medical Staff" of the defendant hospital.

This problem is the exact one confronted by Mr. Justice Douglas in his concurring opinion in *Doe v. Bolton,* 410 U.S. 179 at 219–20, 93 S.Ct. 739 at 761, 35 L.Ed.2d 201:

The right of privacy has no more conspicuous place than in the physician-patient relationship unless it be in the priest-penitent relationship.

It is one thing for a patient to agree that her physician may consult with

another physician about her case. It is quite a different matter for the State compulsorily to impose on that physician-patient relationship another layer or, as in this case, still a third layer of physicians. The right of privacy—the right to care for one's health and person and to seek out a physician of one's own choice protected by the Fourteenth Amendment—becomes only a matter of theory, not a reality, when a multiple-physician-approval system is mandated by the State.

The State licenses a physician. If he is derelict or faithless, the procedures available to punish him or to deprive him of his license are well known. . . . The good-faith decision of the patient's chosen physician is overridden and the final decision passed on to others in whose selection the patient has no part. This is a total destruction of the right of privacy between physician and patient and the intimacy of relation which that entails.

The right to seek advice on one's health and the right to place reliance on the physician of one's choice are basic to Fourteenth Amendment values. We deal with fundamental rights and liberties, which, . . . can be contained or controlled only by discretely drawn legislation that preserves the "liberty" and regulates only those phases of the problem of compelling legislative concern.

\* \* \* \* \* \*

To protect the woman's right of privacy . . . the control must be through the physician of her choice and the standards set for his performance.

Although it is true that the prohibition of the husband from the delivery room is not a deprivation of the magnitude of the prohibition of an abortion neither is the state's interest in the former of the same magnitude. In fact, it is so noncompelling as to be virtually nonexistent: the hospital fears that the participating husband may catch a glimpse of other women in labor and that it does not have facilities for him to don and doff his hospital gown.

Furthermore, the magnitude of the importance of the presence of the expectant father should not necessarily be downgraded. The moment of delivery is a crucial psychological milestone in the life of the mother. It is probably equally crucial to those fathers who are allowed to be present. In any event, to deny the right of her mate's presence when she desires it at a critical time is unnecessarily, and I believe unconstitutionally, cruel to the expectant mother.

In *United States v. Vuitch,* 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971), Mr. Justice Black said for the Court at 72, 91 S.Ct. at 1299:

Certainly this construction [permitting abortions for mental health reasons] accords with the general usage and modern understanding of the word "health," which includes psychological as well as physical wellbeing. Indeed Webster's Dictionary, in accord with that common usage, properly defines health as the "[s]tate of being . . . sound in body [or] mind." Viewed in this light, the term "health" presents no problem of vagueness. Indeed, whether a particular operation is necessary for a patient's physical or mental health is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered.

I would reverse and remand for a trial on the merits.