**Ruth E. BUCK,**
**Plaintiff-Appellant-Appellee,**

v.

**The BOARD OF EDUCATION OF the CITY OF NEW YORK,**
**Defendant-Appellant-Appellee,**

**Dr. Bernard E. Donovan et al.,**
**Defendants.**

**Nos. 216, 372, Dockets 75–7583, 75–7636.**

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1977.

Decided April 20, 1977.

Ruth E. Buck, pro se.

Francis F. Caputo, New York City (W. Bernard Richland, Corp. Counsel of the City of New York, L. Kevin Sheridan, New York City, of counsel), for The Board of Education.

Leonard Stecher, New York City, for Division of Human Rights of State of New York.

Nicholas G. Garaufis, Deputy Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., Nicholas G. Garaufis, Deputy Asst. Atty. Gen., New York City, of counsel), for appellees Hon. Frederick Backer and employees of the District Attys. of New York and Kings Counties.

Lawrence W. Reich, Albany, N.Y. (Robert D. Stone, Albany, N.Y., of counsel), for New York State Supervisory Committee.

Before MOORE, OAKES and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

Plaintiff Ruth E. Buck, formerly a tenured guidance counselor employed by the Board of Education of the City of New York ("the Board"), commenced this action in 1971, pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, against the Board and numerous other defendants, alleging that her discharge from school employment in 1969 deprived her of her civil rights. On December 2, 1974, the late Judge Judd of the Eastern District of New York entered a judgment in plaintiff's favor, and after further hearings determined to require the Board to pay Mrs. Buck $62,324.23 in back salary plus interest. The judgment was based on a finding that the administrative hearing procedure that resulted in Mrs. Buck's dismissal violated her right to procedural due process of law. Both Mrs. Buck and the Board appeal from differing aspects of the district court's decision.

### I.

Mrs. Buck had been employed for over ten years in the New York City public school system before the events leading to her dismissal, serving most recently as a tenured guidance counselor at Franklin K. Lane High School in Brooklyn, New York.

In June, 1968, defendant Morton Selub, Principal of that High School, submitted a report to Dr. Sidney Leibowitz, Medical Director of the Board of Education, requesting that plaintiff be given a medical, i. e., psychiatric, examination. Mr. Selub asserted that plaintiff had refused to follow the instructions of her supervisor, defendant Mary Cohen, the Administrative Assistant in charge of Guidance. The report also described several incidents of allegedly strange behavior by Mrs. Buck observed by Mr. Selub, Mrs. Cohen, and defendant Sheldon Wein, the school's Assistant Dean of Boys. Dr. Leibowitz agreed that plaintiff should be given the medical examination.

There followed an extended series of attempts to have Mrs. Buck undergo the examination. On July 25, 1968, Dr. Leibowitz asked her to appear on August 1. Mrs. Buck refused, saying that she had a prior engagement. On August 6, she was sent a notice of an appointment scheduled for August 27; she replied that she could not attend because she was planning to be out of town. The next notice scheduled the appointment for September 5, but Mrs. Buck responded that any appointment would have to await the opening of the school term.

On September 6, Mrs. Buck, represented by counsel, commenced a proceeding in New York state court seeking to rescind the order for the examination. The Superintendent of Schools, defendant Bernard Donovan, as a party to that state proceeding, agreed by stipulation not to compel the medical examination until the termination of the litigation. As it happened, it was not until May 21, 1969 that the New York Supreme Court dismissed Mrs. Buck's petition, holding that the Board's examination request was not arbitrary, capricious or unreasonable.

The futile procession of scheduling notices was thereupon renewed. Mrs. Buck received notice of an examination scheduled for September 24, 1969, but replied that she would not attend because the notice had not been signed "by hand". The other notices called for an examination on October 15, a "Vietnam Moratorium" day; Mrs. Buck responded that she intended to "take that day off". A seventh notice dated October 16 was also unavailing, and an eighth notice called for Mrs. Buck's appearance on November 6, 1969.

After last-minute attempts to avoid the November 6 appointment, plaintiff went to the Board Medical Office, ostensibly to submit to the examination. But on her arrival she refused to sign in or fill out any forms until she had seen a supervisor. After waiting for a physician for approximately a half hour, she departed, saying that because it was three o'clock her working hours were over.

On the basis of these repeated refusals to appear for the medical examination, on December 5, 1969, the Acting Supervisor of Schools, defendant Nathan Brown, charged Mrs. Buck with insubordination and suspended her without pay.

The Board thereupon appointed a trial examiner to hear the case and to recommend what Board action, if any, was required. At the several hearings held by the examiner Mrs. Buck was represented by counsel (defendant David Lubash) and presented her case through witnesses, exhibits, and cross-examination of those witnesses called by the Superintendent. The trial examiner's findings are best summarized in his conclusion that plaintiff's

"intransigent defiance of authority, dictatorial attitude toward supervision, [and] continued evasion of a directive for medical examination which was issued in the prescribed and proper manner, are inexcusable." (Board's App. at 73.)

The examiner recommended that the Board permanently discharge Mrs. Buck from further employment, though he suggested that it first consider offering her one last chance to retain her job by submitting to the examination.

Mrs. Buck was informed by letter that the Board would consider the matter of her suspension at its public meeting on July 22, 1970. She decided to attend the Board's meeting, apparently against the advice of her counsel, but her tardy arrival meant that she missed the Board's consideration of her case and its publicly-announced decision to make her discharge permanent.

On July 23, 1971, appearing *pro se*, Mrs. Buck commenced the instant action in the district court. Her original complaint included as defendants virtually everyone with whom she had been in contact in connection with the proposed medical examination. The thrust of her complaint was that the direction to report for a medical examination was an instance of harassment directed at her by the largely Jewish hierarchy in the city school system because of her white, Anglo-Saxon, Protestant ancestry and her refusal to participate in teacher strikes during 1967 and 1968.

On pretrial motions, Judge Judd dismissed the complaint as against most of the named defendants and *sua sponte* added as an issue for trial, *inter alia*, the question of whether Mrs. Buck was denied due process by the Board's reaching its decision prior to providing her with a copy of the trial examiner's report.

On December 2, 1974, Judge Judd rendered his decision, holding that Mrs. Buck had failed to prove that the request for a medical examination was in any way

prompted by ethnic prejudice or retaliation for her anti-strike attitude. But the court also found that the administrative hearing procedure followed by the Board violated Mrs. Buck's right to procedural due process. She was subsequently awarded over $60,000 in back pay plus interest. The Board appeals from the finding of a due process violation and the fixing of liability upon it. Mrs. Buck also appeals, appearing *pro se* to contend, *inter alia*, that the district court erred in dismissing the complaint against many of the original defendants and in computing the damage award.

II.

Mrs. Buck's position as a tenured guidance counselor is indisputably a property interest encompassed within the fourteenth amendment's due process protection. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). Thus, the parties to this case agree that she could not be permanently discharged from employment without adherence to the procedural protections which are guaranteed her by the due process clause.

At issue here, rather, is the exact measure of procedural protection to be accorded Mrs. Buck. The district court reasoned that her failure to receive a copy of the trial examiner's report before the Board meeting at which the final decision in her case was rendered in itself amounted to a constitutional violation. As the court below reasoned,

"a person who faces dismissal should have a right to see the report before the Board acts on it and to argue with respect to the action to be taken on it." (Board's App. at 124, as modified at 130.)

■ However, the district court erred by placing excessive emphasis on the particular course of the report of the trial examiner. In reviewing state action in the area of procedural due process, federal courts must look to the whole substance of a proceeding, not merely to its bare form, in determining whether the process at issue abides by the constitutional minimum of protection. *Bell v. Burson*, 402 U.S. 535, 541, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). In that analysis the courts must "fully [realize] . . . that the interpretation and application of the Due Process Clause are intensely practical matters," *Goss v. Lopez*, 419 U.S. 565, 577–78, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975), and must be mindful of

"the importance of not imposing upon the States or the Federal Government . . any procedural requirements beyond those demanded by rudimentary due process." *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970).

■ The exact procedures mandated by due process will vary from one context to another, *Bell v. Burson, supra*, 402 U.S. at 540, 91 S.Ct. at 1748, for the "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Of course, it has long been recognized that the fundamental requisite is that the person who is to be deprived of a protected interest be given adequate notice of the proceeding and the charges alleged, as well as afforded a fair opportunity to be heard. *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233, 17 L.Ed. 531 (1863); *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). In the specific context of educational employment, the Supreme Court has expressed the due process standard as requiring a hearing where the employee can be informed of the grounds for his or her possible discharge and can challenge their sufficiency. *Perry v. Sindermann*, 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *Cf. Goss v. Lopez, supra*, 419 U.S. at 579, 95 S.Ct. 729, 738 (public high school students facing suspension entitled to "*some* kind of notice and . . *some* kind of hearing") (emphasis in original).

The facts of this singular case reveal that the Board's procedure satisfied this standard with regard to Mrs. Buck. Mrs. Buck was afforded explicit notice of the allegations raised against her. She received a complete written statement of the Superintendent's charges and specifications as early as the decision to suspend her, and she confronted the full case against her later in the hearings before the trial examiner. Moreover, she was given ample opportunity by the trial examiner to explain or contradict the charges in an adversarial context. She was represented by counsel, who took full advantage of the chance to present her defense, using witnesses, exhibits, and extensive cross-examination of those who testified for the Superintendent.

In addition, the meeting at which the Board formally made its decision was open to the public and offered Mrs. Buck another effective opportunity to contest the charges against her. It was Mrs. Buck's absence, not Board procedure, which prevented her inclusion in the discussion of the matter at that time of final decision.

We also note that, at the time, neither Mrs. Buck nor her lawyer seemed to place great significance on the trial examiner's report; they did not request a copy of it from either the Board or the examiner, nor did they make any effort to learn the substance of its recommendations.[1] At no time in these proceedings has Mrs. Buck pointed to any evidentiary or conclusory irregularity in the examiner's report or recommendation. We have held in the context of selective service regulations that such a failure to establish any harm or prejudice will preclude a finding of procedural violation. *Nurnberg v. Froehlke,* 489 F.2d 843, 848 (2d Cir. 1973). *See also United States v. Bellmer,* 404 F.2d 132, 135 n. 6 (3d Cir. 1968);

*United States v. Ford,* 478 F.2d 169, 174–75 (1st Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 113, 38 L.Ed.2d 91 (1973).

The district court cited only two federal cases in support of a finding of a procedural defect here. Both concern procedures established by statute and regulation to govern selective service classifications, and both fail to lend precedential credence to the determination below. In *Rohe v. Froehlke,* 500 F.2d 113 (2d Cir. 1974), a member of the United States National Guard failed to report for a required training session, claiming that he had been ill and confined to his home. His unit commander disbelieved the excuse and ordered that Rohe be called for active duty. Rohe was advised that, pursuant to Army regulations, he could appeal his commander's decision to the Assistant Adjutant General. He did, but he received no evidentiary hearing at all, and was not even informed of relevant factual allegations which his commanding officer was, without his knowledge, continually supplying the Assistant Adjutant General. This court held that the Army regulations which provided Rohe with the opportunity to appeal his commander's decision implicitly required that the appellate process allow Rohe *some* opportunity to respond to his commander's *ex parte* allegations. Here, by contrast, Mrs. Buck not only had a full, adversarial evidentiary hearing, but had available to her the opportunity to respond to the trial examiner's recommendation at the Board's public meeting.

The second case cited, but not discussed, by the district court is *Gonzales v. United States,* 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955), where the Supreme Court held as a matter of statutory construction that

---

1. The dissent makes much of the "risk" that Mrs. Buck had "no idea" of the contents of the trial examiner's report. Mrs. Buck did make the allegation of lack of knowledge in her affidavit of May 7, 1974. But Judge Judd carefully avoided endorsing her assertion; he noted only that there was nothing in the record expressly contradicting it. His caution was well-taken, for common sense belies any assertion that one who participates in a fully adversarial, evidentiary hearing regarding her own conduct would not be familiar with the basic substance of the trial examiner's report. *See Blanton v. State University of New York,* 489 F.2d 377, 385–86 (2d Cir. 1973). Indeed, an assumption of lack of knowledge makes entirely unintelligible the failure of Mrs. Buck or her attorney to request a copy of the report prior to the public Board meeting.

the Military Selective Service Act in effect at that time, 62 Stat. 604 *et seq.* (1948), *as amended,* 50 U.S.C.App. § 451 *et seq.,* required that a candidate whose application for conscientious objector status was being considered be afforded an opportunity to present a reply to the Justice Department's recommendation of denial in his case. Gonzales, a Jehovah's Witness, was denied conscientious objector status by his local draft board. He duly appealed to the Appeals Board of the Selective Service, which referred his case to the Justice Department for an investigation. An informal hearing was held before a Department hearing officer who recommended a denial of conscientious objector status. The Department of Justice in its report to the Appeals Board made the same recommendation and the Appeals Board approved the denial.

The significant failure of this procedure, the defect which the Supreme Court considered fatal and which is crucial to our understanding of that case's relevance here, is that, under the statutory scheme before the Court, Gonzales was *at no time* either notified of the Appeals Board's renewed consideration of his case after receipt of the Department's report, or given an opportunity to appear or file a reply in response to the Department's recommendation. 348 U.S. at 410–11, 75 S.Ct. 409. The Court's reasoning made clear that it was primarily the regulatory scheme's failure to allow for an effective opportunity for Gonzales to appear before the Board to dispute the Department's recommendation which rendered his classification invalid. 348 U.S. at 412–13, 75 S.Ct. 409.

The circumstances of the case before us show that Mrs. Buck was not deprived of an opportunity to rebut the recommendation of the trial examiner. She was informed fully one week in advance that her case would be considered at an upcoming public meeting of the Board of Education. There is no evidence in the record suggesting that had Mrs. Buck been present when her dismissal was discussed she would not have been afforded a full opportunity to present her views in response to the trial examiner's recommendation. She cannot reasonably claim that the procedural treatment accorded her failed to guarantee that fundamental fairness which is the heart of due process.

Mrs. Buck's interest in retaining her job was obviously a strong one. But there was little practical risk that she would be erroneously discharged after the full evidentiary hearing before the trial examiner and an opportunity to state her case in public before the Board. Thus, we cannot say that in this case the due process clause mandated a rigid rule requiring the Board to provide Mrs. Buck with the trial examiner's report prior to the Board's public meeting.

In a recent opinion concerning the scope of procedural due process in the context of public education, the Supreme Court repeated an admonition against excessive judicial interference with any local procedure which, under the circumstances presented, provides the constitutional minimum of protection:

> "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities." *Goss v. Lopez, supra,* 419 U.S. at 578, 95 S.Ct. at 738, quoting from *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

The facts of this case reveal that Mrs. Buck was afforded clear notice of the charges being brought against her and was allowed ample opportunity to present her views in rebuttal. The due process clause, in this case, requires no more.

In light of our holding, it is not necessary for us to consider the other issues raised on appeal. The judgment of the district court finding a violation of the fourteenth amendment is reversed. The district court's pretrial dismissal of defendants is affirmed.

OAKES, Circuit Judge (dissenting):

It is conceded by all that, as the majority opinion states, "Mrs. Buck's position as a

tenured guidance counselor is indisputably a property interest encompassed within the fourteenth amendment's due process protection" and that "[her] interest in retaining her job was . . . a strong one." The majority and I are also in agreement that the federal courts should avoid "excessive interference" with constitutionally adequate local procedures, a proposition with which Judge Judd below expressed concurrence. He wrote:

> The question is not . . . the discretion of the Board of Education in determining the outcome, but the procedure of the Board in deciding a contested matter without affording plaintiff a proper hearing.

On this question, the majority and I part company.

It is important at the outset to emphasize the nature of the procedure at stake in this case. The majority speaks of the due process clause as not mandating a "rigid rule," but it never indicates how the School Board would have been burdened by sending to Mrs. Buck, prior to the Board meeting, a copy of the trial examiner's report that it sent to her after the meeting. Nor does the majority indicate what rigidity would arise from allowing a tenured teacher or counselor facing possible dismissal to respond, either orally or in writing, to charges in the examiner's report before the Board makes a final decision. In contrast to the situation in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), where it appeared that the Government would have to spend substantial additional sums if the procedures at issue were adopted, *see id.* at 348–49, 96 S.Ct. 893, here there is little likelihood that any additional sums will be spent if the State is required to give a tenured teacher or counselor the examiner's

report and an opportunity to respond prior to dismissing him or her.

The majority opinion repeats several times its conclusion that Mrs. Buck did have an opportunity to respond prior to the Board's decision, an opportunity that, one would gather from the majority opinion, she lost only because of her own tardiness (she arrived at the Board meeting 15 minutes late). This conclusion, however, ignores both common sense and trial court findings of fact that we are bound to accept unless "clearly erroneous," Fed.R.Civ.P. 52(a). The majority offers no explanation as to how one can intelligently respond to a report one has not seen, particularly when, as Judge Judd found here, the one who is supposed to be responding has "no idea" what the report contains.[1] *See In re Gault*, 387 U.S. 1, 33–34 & n. 54, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Even the most skilled of lawyers might have difficulty accomplishing such a feat. Moreover, even assuming that she knew what the report contained as to facts, without seeing it she could not know what recommendations were made by the trial examiner.

As for Mrs. Buck's tardiness in attending the Board meeting, it was essentially irrelevant. The majority does not challenge Judge Judd's finding, based on the testimony of a Board member, that the actual decision to fire Mrs. Buck was made at an informal meeting prior to the public, formal meeting at which Mrs. Buck appeared. Hence the "opportunity" to which the majority refers was at best an opportunity to respond to a *fait accompli* on a subject as to which she was given no guidance until after the time for response had passed.

It is true that, as the majority opinion emphasizes, Mrs. Buck had a hearing before

---

1. The judge's finding in his Memorandum of Decision of December 2, 1974, was:

> No explanation is given of how plaintiff is supposed to have known the contents of a report which had not been disclosed to her. Her affidavit of May 7, 1974 states that she had no idea what the report contained and no idea that she was actually being dismissed. Nothing to the contrary was developed at the hearing before the court.

[Mrs. Buck's attorney] wrote to the Board on July 27, 1970, after receiving the report, and pointed out that plaintiff had not been given a new opportunity to submit to a medical examination as had been recommended by the trial examiner, and that she was now ready to submit.

a Board-appointed trial examiner. The adequacy of that hearing is not questioned, but it hardly follows that the hearing alone meant there was, in the majority's words, "little practical risk that she would be erroneously discharged." The reasoning of the Supreme Court in *Gonzales v. United States*, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955), cited by the court below, is instructive on this question. In *Gonzales*, a man contesting his draft board's denial of conscientious objector status was given a hearing before an examiner as part of the administrative process. The examiner's report and the ensuing Justice Department recommendation based on it were forwarded to an "Appeal Board," which in such cases acted not in an appellate capacity but rather as "the only decision-making body to pass on the entire file." *Id.* at 413, 75 S.Ct. at 412. Neither the report nor notice of the recommendation was "given petitioner prior to the Appeal Board's decision." *Id.* at 410–11, 75 S.Ct. at 411. The Supreme Court held that, under the statute in question as well as "underlying concepts of procedural regularity and basic fair play," the petitioner had to be given "a copy of the recommendation of the Department . . . at the time it is forwarded to the Appeal Board, and . . . an opportunity to reply." *Id.* at 412, 75 S.Ct. at 412. The constitutional due process underpinning of this holding has been recognized explicitly by the First Circuit, *Crotty v. Kelly*, 443 F.2d 214, 217 (1st Cir. 1971), and implicitly by our court and the Third Circuit, *Rohe v. Froehlke*, 500 F.2d 113, 116 (2d Cir. 1974); *Hoffmann-LaRoche, Inc. v Kleindienst*, 464 F.2d 1068, 1072 & n. 6 (3d Cir. 1972).

The reasons advanced by the *Gonzales* Court for imposing procedural requirements similar to those sought by Mrs. Buck go directly to the possibility of an erroneous decision, which the majority here treats so lightly. The Court pointed out that, if a person is not "cognizant of all the facts" possessed by the final decisionmaking body and of the position of the one recommending a decision, he or she cannot present an effective case, and the decisionmakers cannot be sure that they possess "*all* of the relevant data." 348 U.S. at 413, 75 S.Ct. 409. (emphasis in original). Particularly given the advisory nature of the Justice Department's recommendation, the *Gonzales* Court ruled, it was essential that the person affected "be given an opportunity to rebut [the] recommendation when it comes to . . . the agency with the ultimate responsibility for [decision]." *Id.* at 412, 75 S.Ct. at 412. Similarly, in the instant case the School Board had "ultimate responsibility," *Buck v. Brown*, No. 11086/69 (N.Y. Sup.Ct. Mar. 20, 1970), with the examiner's report being advisory, as he recognized by making "recommendations" to the Board.

The risk of error here is even more significant than in *Gonzales*, moreover, since here there was testimony from a Board member that only one of the five members would read the material in a given case. It is obvious from this testimony that the Board placed principal reliance on the trial examiner's report, rather than on the record developed at the hearing, and in such circumstances it becomes particularly critical that the person affected be given an opportunity to challenge the examiner's findings and conclusions before any decision is made. Without such an opportunity, the entire decision rests on the findings of one person, the trial examiner, who, no matter how conscientious, will occasionally make mistakes. *Compare Mathews v. Eldridge, supra*, 424 U.S. at 343–47, 349, 96 S.Ct. 893 (procedures for making initial disability determination were very reliable, and claimant had right to full hearing and judicial review before denial of claim became final).[2]

---

2. *See also* Administrative Procedure Act, 5 U.S.C. § 557(c), which provides in part:

Before . . . a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit . . .

exceptions to the . . . recommended decisions of subordinate employees . . . and

supporting reasons for the exceptions . . . .

The degree of risk of error deemed acceptable, of course, is related to the seriousness of the consequences for the individual if an erroneous decision is made. *See Mathews v. Eldridge, supra,* 424 U.S. at 341–42, 96 S.Ct. 893; Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L.Rev. 1267, 1278, 1295–1304 (1975). Here the Board's action—dismissal from a tenured position—was plainly quite serious, as the majority recognizes; the dismissal "depriv[ed] a person of a way of life to which [s]he has devoted years of preparation and on which [s]he and [her] family have come to rely," Friendly, *supra,* 123 U.Pa.L.Rev. at 1297 (revocation of professional licenses). When such serious consequences are involved, procedures that substantially reduce the risk of error at low or no cost to the public are mandated by the due process clause. *See Mathews v. Eldridge, supra,* 424 U.S. at 334–35, 96 S.Ct. 893.

Because I conclude that Mrs. Buck was denied due process of law, this dissent must reach two other issues raised by the School Board. The first involves the argument that, because Mrs. Buck brought certain state actions in which she could have, but did not, raise her Fourteenth Amendment claim, she is barred by res judicata from raising that claim here. As the Board recognizes, however, the identical argument was rejected by this court in *Lombard v. Board of Education,* 502 F.2d 631 (2d Cir. 1974), *cert.denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975), an action brought under 42 U.S.C. § 1983, and the *Lombard* holding was applied to actions brought directly under the Fourteenth Amendment by the panel majority in *Brault v. Town of Milton,* 527 F.2d 730, 733 n. 5 (2d Cir.), *rev'd en banc on other grounds,* 527 F.2d 736 (2d Cir. 1975). I

would follow these cases here and hold that Mrs. Buck's federal action is not barred by the doctrine of res judicata.

The second issue raised by the Board involves the validity of a direct suit under the Fourteenth Amendment in a situation in which, because of the doctrine of municipal immunity, *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), applied by our court to school boards in *Monell v. Department of Social Services,* 532 F.2d 259 (2d Cir. 1976), *cert. granted,* 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977), a suit under 42 U.S.C. § 1983 cannot be brought.[3] The panel majority in *Brault v. Town of Milton, supra,* held that such a direct suit was available, and the en banc majority, in reversing, explicitly declined to reach the question, 527 F.2d at 738. I would follow the *Brault* panel decision in this case. The decision is directly supported by Judge Moore's decision for a unanimous panel in *Matherson v. Long Island State Park Commission,* 442 F.2d 566 (2d Cir. 1971), as well as by a "well-developed body of case law" in other circuits, 1 N. Dorsen, P. Bender & B. Neuborne, *Political and Civil Rights in the United States* 1543 (4th ed. 1976). *See e. g., Cox v. Stanton,* 529 F.2d 47, 50–51 (4th Cir. 1975); *Fitzgerald v. Porter Memorial Hospital,* 523 F.2d 716, 718–19, n. 7 (7th Cir. 1975) (Stevens, *J.*), *cert. denied,* 425 U.S. 916, 96 S.Ct. 1518, 47 L.Ed.2d 768 (1976); authorities cited in *Brault v. Town of Milton, supra,* 527 F.2d at 744 (dissenting opinion). I would therefore hold that Mrs. Buck may sue the School Board under the Fourteenth Amendment, with jurisdiction premised on 28 U.S.C. § 1331.[4]

In all other respects, I agree with Judge Judd. I would affirm his judgment for Mrs. Buck and therefore I dissent.

3. In *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court expressly left "for another day"—which evidently is not far away—the questions whether a school board is a "person" for purposes of 42 U.S.C. § 1983, and, if it is not, whether a suit

against the Board may nevertheless be sustained as a direct constitutional action, with jurisdiction premised on 28 U.S.C. § 1331. At 279, 97 S.Ct. 568.

4. Mrs. Buck alleged (and was awarded) damages substantially in excess of $10,000.